RAILROAD COMMISSION of Texas et al., Appellants,

v.

UNITED GAS PIPE LINE COMPANY, Appellee.

No. 10995.

Court of Civil Appeals of Texas.

Austin.

June 13, 1962.

Rehearing Denied July 11, 1962.

Will Wilson, Atty. Gen., Houghton Brownlee, Jr. Asst. Atty. Gen., Austin, Crawford B. Reeder, Matthews, Nowlin, MacFarlane & Barrett, San Antonio, P. H. Swearingen, Morrison, Dittmar, Dahlgren & Kaine, San Antonio, Sears & Burns, Houston, Black & Stayton, Austin, for appellants.

Vinson, Elkins, Weems & Searls, Raybourne Thompson, Houston, Carl Wright Johnson, San Antonio, Clark, Thomas, Harris, Denius & Winters, Mary Joe Carroll, James H. Keahey, Austin, W. O. Crain, Saunders Greeg, Shreveport, La., of counsel, for appellee.

HUGHES, Justice.

This appeal is from a judgment invalidating and enjoining enforcement of the following order of the Railroad Commission of Texas:

"RAILROAD COMMISSION OF TEXAS GAS UTILITIES DIVISION

GAS UTILITIES DOCKET NO. 283

"IN RE: PETITION OF UNITED GAS PIPE LINE COMPANY CONCERNING FUTURE DELIVERIES OF NATURAL GAS TO THE CITY OF SAN ANTONIO BY ALAMO GAS SUPPLY COMPANY.

"WHEREAS, On the 21st day of June, 1961, the Railroad Commission of Texas received a petition, dated the 20th day of June, 1961, from United Gas Pipe Line Company requesting that the Railroad Commission of Texas hold a hearing and that upon hearing determine that it is contrary to the public interest for Alamo Gas Supply Company to construct facilities into the San Antonio area and supplant United Gas Pipe Line Company; that it is contrary to the public interest for San Antonio to obtain its natural gas from Alamo Gas Supply Company rather than continue to obtain its natural gas requirements from United Gas Pipe Line Company; that the contract between San Antonio and Alamo Gas Supply Company is null and void and contrary to the laws and public policy of this state and that it be disapproved; that pending a hearing and final determination, the Commission order Alamo Gas Supply Company and San Antonio not to carry out the provisions of the contract or to take any action which would in any manner affect or prejudice the ultimate determination of the validity of such contract and the public interest; and

"WHEREAS, the Commission has considered Article I, Section 26 of the Constitution of the State of Texas which provides that, 'Perpetuities and monopolies are contrary to the genius

of a free people and shall never be allowed'; and

"WHEREAS, The Commission has considered Section I of Article 7428–A, Revised Civil Statutes of Texas, 1925, as Amended, which provides, 'That monopolies are contrary to the public policy of the State of Texas; and it shall hereafter be unlawful for any person, company, partnership or corporation, domestic or foreign, doing business in the transportation and/or sale of natural gas, electric current and power, telephone services, telegraph services and/or similar public utilities to wilfully and intentionally do any act whatever to prevent or hinder any legitimate competition in such business.'

## "ORDER

"IT IS ORDERED, ADJUDGED AND DECREED BY THE RAILROAD COMMISSION OF TEXAS, That it is without jurisdiction of the above set out subject matter, and therefore denies the petition in its entirety."

This order was entered, as indicated, in response to a petition filed with the Commission by appellee, United Gas Pipe Line Company. We quote from such petition:

"United Gas Pipe Line Company (United) petitions the Railroad Commission of Texas (Commission), pursuant to Articles 6053 and 6054 of the Revised Statutes of Texas, to hold a hearing to determine whether it is in the public interest for Alamo Gas Supply Company (Alamo) to construct facilities into the San Antonio area and supplant United, the present supplier of gas in the San Antonio area; whether it is in the public interest for the City of San Antonio, acting through the City Public Service Board of San Antonio (collectively called 'San Antonio'), to obtain its natural gas requirements from Alamo rather than continuing to obtain its natural gas requirements from United; to review the

natural gas service contract between San Antonio and Alamo entered into on June 14, 1961, for the purpose of determining whether such contract violates the statutes of this State and whether it is contrary to the public policy of this State. * * *

"United is a Delaware corporation authorized to conduct business within the State of Texas and owns and operates a natural gas pipe line system within the State of Texas. In connection therewith, it transports and delivers natural gas to consumers for their use and to municipalities and others engaged in selling and distributing natural gas for sale to the public. By virtue thereof, United is a public utility subject to the jurisdiction of the Commission under Articles 6050–6066, Revised Statutes of Texas.

"Alamo is a Texas corporation incorporated for the purpose of owning and operating a natural gas pipe line system and has the right to exercise the power of eminent domain. Alamo has entered into a natural gas service contract with San Antonio dated June 14, 1961 and pursuant thereto will promptly commence the construction of a natural gas pipe line system to serve San Antonio and, upon completion prior to April 1, 1962, will transport and deliver natural gas for sale to San Antonio for use in San Antonio's steam generated electric power plants and for distribution to the public and others in the City of San Antonio and surrounding area. By virtue thereof, Alamo is a public utility subject to the jurisdiction of the Commission under Articles 6050–6066, Revised Statutes of Texas.

"San Antonio transports, distributes and delivers natural gas to the public and others for compensation in the City of San Antonio and surrounding areas. By virtue thereof, San Antonio, in the conduct of such business, is a public utility subject to the jurisdiction of the

Commission under Articles 6050–6066, Revised Statutes of Texas. * * *

"San Antonio is the largest customer of United in the San Antonio District; and in the calendar year 1960, 59% of United's total San Antonio District sales were purchased by San Antonio. The natural gas supplied San Antonio by United is used for fuel in San Antonio's steam generated electric power plants and is sold through San Antonio's distribution system to the public for domestic and industrial consumption in the City of San Antonio and surrounding areas. * * *

"United is presently furnishing San Antonio its natural gas requirements pursuant to a 15⅓ year term gas service agreement providing for a fixed price for the term and which expires April 1, 1962. * * *

"It is contrary to the public interest for Alamo to construct facilities into the San Antonio area and supplant United and for San Antonio to obtain its natural gas requirements from Alamo rather than continuing to obtain such requirements from United; and the natural gas service agreement between San Antonio and Alamo dated June 14, 1961 is null and void in that it is contrary to the laws and the public policy of the State of Texas and should not be approved by the Commission—all for the following reasons:

"(1) United is the present supplier of the natural gas requirements of the City of San Antonio. It and its predecessor companies has been rendering adequate and satisfactory gas service to the City of San Antonio and surrounding territory at reasonable rates for nearly forty years.

"(2) Alamo is a newly organized company, and has not been engaged in the natural gas pipe line business, and is not now rendering any service in the San Antonio area or elsewhere; it has not demonstrated its ability to supply either the present or future requirements of San Antonio or any other customer.

"(3) United is one of the oldest, largest and most completely integrated natural gas pipe line companies in the country. It operates an interconnected gas pipe line system extending throughout five states. Its officers and management have been engaged in the natural gas business for many years. * * *

"Alamo is a newly organized company, entering into the gas business for the first time. It has not demonstrated to this Commission that it has the experience, the organization, or the financial ability to adequately and properly carry on a natural gas business and to serve the requirements of San Antonio efficiently and satisfactorily and at reasonable rates. * * * Alamo has not yet constructed any facilities into the area and has not demonstrated to this Commission the amount of reserves that it can connect and make available for serving the City. * * *

"(6) The mere desire by San Antonio to disconnect from United and to obtain its gas requirements from another supplier is not a sufficient or proper reason for permitting such other supplier to come into the area already adequately served and to duplicate United's existing facilities and services, bringing about destructive economic waste, and resulting in the operation of a substantial portion of United's extensive and costly pipe lines and facilities at an extremely low load factor. * * *

"If United ceases to supply San Antonio with its natural gas requirements, United will suffer a revenue deficiency of many millions of dollars in the San Antonio District which will result in a substantial increase in the cost of natural gas to the other cities and towns

served by United in the District since United's cost of delivering gas at the city gate is a direct function of volume.

\* \* \*

"The contract between San Antonio and Alamo is null and void and in violation of the laws of this State in that it attempts to dedicate specific gas reserves to San Antonio for a period of twenty years at a fixed price and thereby attempts to deny to the Commission powers over such matters which are given to the Commission by statute.

\* \* \*

"WHEREFORE, premises considered, United prays that the Commission hold a hearing and that upon hearing determine that it is contrary to the public interest for Alamo to construct facilities into the San Antonio area and supplant United; that it is contrary to the public interest for San Antonio to obtain its natural gas requirements from Alamo rather than continue to obtain its natural gas requirements from United, and that the contract between San Antonio and Alamo is null and void and contrary to the laws and public policy of this State and that it be disapproved. Pending a hearing and final determination, United prays the Commission to order Alamo and San Antonio not to carry out the provisions of the contract or to take any action which would in any manner affect or prejudice the ultimate determination of the validity of such contract and the public interest."

There are many allegations in the petition not quoted which amplify and detail the alleged invalidity of the Alamo-San Antonio contract, the detriments to be suffered by honoring such contract and the benefits to be derived by dishonoring it.

No evidence was heard in the Trial Court. The cause was determined upon the stipulation of the parties that for the purpose of this suit allegations of fact in certain pleadings of appellee were taken as true. We accept as correct the facts shown in the following summary taken from the brief of appellee:

"1. United, a gas pipe line public utility, has been serving the City of San Antonio for almost forty years. It is one of the oldest and most completely integrated natural gas pipe line companies in the United States. To serve its San Antonio District, United has over 1300 miles of pipe line, connected to 76 gas fields with a total gas reserve in excess of four and one-half trillion cubic feet. The present fair value of its pipe line facilities in the San Antonio District is in excess of forty million dollars. United serves approximately fifty-five cities and towns in this San Antonio District including San Antonio. United has the facilities, reserves and ability to furnish all the gas requirements of San Antonio and the other cities in the San Antonio District for the foreseeable future.

"2. In July 1960 the C.P.S.B. (an agency of the City of San Antonio which operates the city-owned gas and electric distribution system) called for bids for a 20-year gas supply contract to commence April 1, 1962, termination date of its gas supply contract with United. After receiving original bids, the C.P.S.B., on September 23, 1960, sent out revised forms of a proposed gas supply contract to each of the bidders, requiring that they resubmit their bids according to such form. Among other things, this form required a fixed price for the full 20 years and the dedication of specific gas reserves and facilities to the exclusive use of the City of San Antonio. In submitting its bid, United refused to include these illegal provisions.

"3. Finding none of the public bids to its satisfaction, the C.P.S.B. entered into private negotiations with Glen A. Martin and R. F. Schoolfield, and on January 12, 1961, announced that

it had 'awarded' the gas supply contract to Alamo (a corporation not then in existence, but which was later organized by Martin and Schoolfield). At this time, neither Martin nor Schoolfield had any gas reserves, pipe lines, or financing necessary to perform such a contract. This 'award' was not a contract but was a device to help Martin and Schoolfield obtain the gas reserves, pipe line system and financing that they needed before they could enter into a gas supply contract.

"4. After further private negotiations with Alamo during the spring of 1961, the C.P.S.B. again advertised publicly that it would enter into a 20-year gas supply contract on June 14, 1961. Pursuant to this public notice, United submitted a further bid which, during the first five years of the term, would result in a savings of more than $5,-600,000 to the people of San Antonio as compared with the Alamo price. This offer was summarily rejected by the C.P.S.B. because United did not dedicate specific gas reserves and facilities to San Antonio and did not guarantee a fixed price for twenty years.

"5. On June 14, 1961, C.P.S.B. executed a gas supply contract with Alamo, the terms of which were entirely different both from any of Alamo's public bids and from the 'award' of January 12, 1961. By the June 14, 1961, contract, Alamo: (1) dedicated specific gas reserves and facilities to San Antonio's exclusive use; (2) guaranteed a fixed price for 20 years, escalating 1 cent per m. c. f. each five years; and (3) agreed that it would not sell gas to anyone in Bexar County other than the C.P.S.B.

"6. On this same date and through later contracts, Alamo also agreed to: (1) obtain its principal gas supply from Coastal States Gas Producing Company (the highest bidder in all public bids) and Rio Grande Valley Gas Company; (2) jointly build with Coastal States a gas pipe line to run from Coastal States' Lo-Vaca system in South Texas to San Antonio; (3) surrender control of its (Alamo's) operations to Coastal States. Under these contracts, Alamo would receive a gross return of only 1⅛ cents per m. c. f. from its contract with the C.P.S.B., out of which it would be required to pay its expenses of operation and amortize its pipe line facilities. This amount of revenue is insufficient for these purposes and will require an increase in Alamo's rates. Thus Coastal States, the highest bidder at the public biddings, owns at least twenty-five per cent (25%) of Alamo's common stock, is the beneficiary of a voting trust agreement for at least fifty-one per cent (51%) of Alamo's common stock, holds a demand obligation against Alamo amounting to millions of dollars, and has emerged for all practical purposes as the supplier of gas to the City of San Antonio. Alamo is a mere buffer to protect Coastal States when the gas supply contract becomes unprofitable and to give an aura of local ownership to the City's gas supplier.

"7. Convinced that the entire C.P.S.B.-Alamo-Coastal States scheme is contrary to the public interest and violates the Gas Pipe Line Utility Act, Article 6050 et seq., United immediately petitioned the Commission (June 21, 1961) to review the transaction. Only five days after United's petition was filed and without any hearing, the Commission entered an order holding that it was without jurisdiction over the controversy and denied United any relief. United promptly appealed this order to the 126th District Court of Travis County. Pleas of Privilege were filed by the City of San Antonio and the C.P.S.B. as to four paragraphs in United's pleadings, and in City of San Antonio et al. v. United Gas Pipe Line Company, Tex.Civ.App., 354 S.W.2d

217, this Court sustained such pleas. The trial court then transferred to the district courts of Bexar County 'the cause of action set forth in paragraphs 7, 8, 9 and 10 on page 20 of Plaintiff's First Amended Original Petition and its First and Second Trial Amendments thereto.' "

The judgment of the Trial Court, from which the Railroad Commission of Texas, Alamo Gas Supply Company, City of San Antonio and the City Public Service Board of San Antonio [1] appeal, recites and decrees:

"That for the purpose of decision herein, allegations of facts and objections to the order of the Railroad Commission of Texas dated June 26, 1961, filed by Plaintiff in its first amended Original Petition and its First and Second Trial Amendments thereto, should be taken as true and correct;

"That the facts and the law are with the Plaintiff and against the Defendants Railroad Commission of Texas, Alamo Gas Supply Company, City of San Antonio and the City Public Service Board of San Antonio, and that Plaintiff is entitled to judgment;

"That the public policy of the State of Texas, as established by the Legislature, is that regulation by the Commission of gas utilities is intended to supplant wasteful duplication of facilities and service;

"That under Article 6050 et seq., V.C.S., the Railroad Commission had jurisdiction of this controversy and was under a duty to exercise such jurisdiction, to develop the facts fully upon hearing, and to determine whether or not the Alamo-City Public Service Board agreement, and the effect thereof, is in the public interest, such public interest being the interest not only of the immediate parties, Alamo Gas Supply Company, City Public Service Board, City of San Antonio and Plaintiff, but embracing the interest of all the people of this State who might be affected by such agreement;

\* \* \* \* \* \*

"That the Railroad Commission of Texas, Gas Utility Docket No. 238 Order, dated June 26, 1961, is null, void and illegal and has no just basis in law or in fact and has the effect of taking Plaintiff's property without due process of law and the denial of equal protection of the law, and that the Defendant Railroad Commission of Texas has jurisdiction over this controversy for each and all of the reasons set forth by Plaintiff in its First Amended Original Petition and its First and Second Trial Amendments thereto,"

Appellants state the only question in this case to be:

"Does a home rule city have the power to determine who shall supply the city's gas distribution system and its electric generating system with gas and the power to fix the terms and provisions of the contract under which such gas shall be supplied, or are such powers vested in the Railroad Commission of Texas? Stated differently, are these important powers to be exercised through local self-government or by a central regulatory authority?"

Appellee phrases the single question presented as follows:

"What is the scope of the jurisdiction of the Railroad Commission of Texas over gas pipe line utilities under the Gas Pipe Line Utility Act, Article 6050 et seq., R.C.S.?"

The specific inquiry, of course, is whether or not the Railroad Commission has been delegated authority by the Legislature to

---

I. For our purposes the City of San Antonio and the City Public Service Board of San Antonio are synonymous.

hear and determine appellees' complaint and to grant the relief it seeks.

It is our opinion that the Legislature has not clothed the Commission with such authority.

■ It is well settled that the Commission has only such powers as are expressly delegated to it, or which are essential to the exercise of its expressly delegated powers. Nash v. Shell Petroleum, 120 S.W.2d 522, Austin Civil Appeals, writ dismissed. Similarly, in Harris v. Municipal Gas Company, 59 S.W.2d 355, Fort Worth Civil Appeals, writ dismissed, it is stated that " * * * the railroad commission acts only as an agent of the Legislature and with no power except such as is given it by statute." To the same effect is Humble Oil and Refining Company v. Railroad Commission, 133 Tex. 330, 128 S.W.2d 9, and Gregg v. Delhi-Taylor Oil Corp., Tex., 344 S.W.2d 411.

From the statement we have made it is obvious and indisputable that: (1) United desires to continue supplying gas to the City of San Antonio, albeit without the consent of the City (2) Alamo desires to perform its contract with the City of San Antonio and supply gas to the City with the consent of the City (3) United is not requesting the Commission to adjust the rates which Alamo proposes to charge the City of San Antonio for gas to be supplied it under the contract (4) United is requesting Commission aid in achieving its objective by determining that the " * * * contract between San Antonio and Alamo is null and void * * *."

The only statutory authority which appellee cites to sustain the jurisdiction of the Commission to grant it the relief prayed for is what is known as the Cox Bill, Arts. 6050–6066, Vernon's Ann.Civ.St.[2] Its brief contains "a detailed analysis of its (Cox Bill) scope and specific terms." We copy this analysis along with appellees' interpolative remarks:

"In fulfilling the purposes of the Act, the Legislature gave the Commission complete jurisdiction over the gas pipe line industry. Articles 6050 to 6066, which cover every phase of a pipe line's activities, may be summarized as follows:

"Article 6050 illustrates the breadth of the statute. It provides:

" 'The term "gas utility" and "public utility" or "utility", as used in this subdivision, means and includes persons, companies and private corporations, their lessees, trustees, and receivers, owning, managing, operating, leasing or controlling within this State any wells, pipe lines, plant, property, equipment, facility, franchise, license or permit for either one or more of the following kinds of business:

" '1. Producing or obtaining, transporting, conveying, distributing or delivering natural gas:

" '(a) for public use or service for compensation;

" '(b) for sale to municipalities or persons or companies, in those cases referred to in paragraph 3 hereof, engaged in distributing or selling natural gas to the public;

" '(c) for sale or delivery of natural gas to any person or firm or corporation operating under franchise or a contract with any municipality or other legal subdivision of this State; or,

" '(d) for sale or delivery of natural gas to the public for domestic or other use.

" '2. Owning or operating or managing a pipe line for the transportation or carriage of natural gas, whether for

2. House Bill 11, Ch. 14, p. 18, General Laws, 3rd called Sess., 36th Leg. (1920) is the original Cox Bill. It is codified in the statutes, and it has been amended in some respects.

public hire or not, if any part of the right of way for said line has been acquired, or may hereafter be acquired by the exercise of the right of eminent domain; or if said line or any part thereof is laid upon, over or under any public road or highway of this state, or street or alley of any municipality or the right of way of any railroad or other public utility; including also any natural gas utility authorized by law to exercise the right of eminent domain.

" '3. Producing or purchasing natural gas and transporting or causing the same to be transported by pipe lines to or near the limits of any municipality in which said gas is received and distributed or sold to the public by another public utility or by said municipality, in all cases where such business is in fact the only or practically exclusive agency of supply of natural gas to such utility or municipality, is hereby declared to be virtual monopoly and a business and calling affected with a public interest, and the said business and property employed therein within this State shall be subject to the provisions of this law and to the jurisdiction and regulation of the Commission as a gas utility.

" 'Every such gas utility is hereby declared to be affected with a public interest and subject to the jurisdiction, control and regulation of the Commission as provided herein.'

"Article 6051 provides:

" 'The operation of gas pipe lines for buying, selling, transporting, producing or otherwise dealing in natural gas is a business which in its nature and according to the established method of conducting the business is a monopoly and shall not be conducted unless such gas pipe line so used in connection with such business be subject to the jurisdiction herein conferred upon the Commission. The Attorney General shall enforce this provision by injunction or other remedy.'

"Article 6052 requires gas pipe lines to keep a registered office with books and records as required by the Commission.

"Article 6053 provides for full control over gas pipe lines by the Commission.

"Section 1 directs the Commission to:

"(1) (a) fix the price of gas

"(b) fix the charge for transporting gas

"(c) establish the regulations for transporting.

"(2) control and supervise:

"(a) gas utilities, and

"(b) their gas business holdings in all of their relations to the public.

"(3) fix division of proceeds between transporters and producers and distributors.

"(4) prescribe and enforce rules and regulations for the government and control of gas utilities in respect to their pipe line facilities.

"(5) (a) regulate and apportion the supply of gas between towns, cities and corporations (markets), and

"(b) (when a gas utility's supply is inadequate) prescribe rules requiring such utility to augment its supply.

"Section 2 directs that malodorants be added to the gas.

"If any doubt is left by Article 6053 as to the full scope of the Commission's jurisdiction, Article 6054 sets it at rest, by providing:

" 'All orders and agreements of any company or corporation, or any person or persons controlling such pipe lines

establishing and prescribing prices, rates, rules and regulations and conditions of service, shall be subject to review, revision and regulation by the Commission on hearing after notice as provided for herein to the person, firm, corporation, partnership or joint stock association owning or controlling or operating the gas pipe line affected.'

"Article 6055 provides that gas pipe lines are to refund to users charges for transportation of gas if they are found by the Commission to be excessive.

"Article 6056 directs gas pipe lines to furnish to the Commission reports of total gas distributed, total gas held in storage, and source of their supply.

"Article 6057 in positive language prohibits discrimination by providing:

" 'No such pipe line public utility shall discriminate in favor of or against any person, place or corporation, either in apportioning the supply of natural gas or in its charges therefor; nor shall any such utility directly or indirectly charge, demand, collect, or receive from any one a greater or less compensation for any service rendered than from another for a like and contemporaneous service; provided this shall not limit the right of the Commission to prescribe different rates and regulations for the use of natural gas for manufacturing and similar purposes, or to prescribe rates and regulations for services from or to other or different places, as it may determine.'

"Article 6058 gives the Commission appellant control over orders by a city fixing the burner tip rates for a private distribution system located in the city.

"Article 6059 authorizes appeal in the following language:

" 'If any gas utility or other party at interest be dissatisfied with the decision of any rate, classification, rule, change, order, act or regulation adopt-

ed by the Commission, such dissatisfied utility or party may file a petition setting forth the particular cause of objection thereto in a court of competent jurisdiction in Travis County against the Commission as defendant. * * *'

"Article 6060 levies a gross receipts tax.

"Article 6061 directs the Commission to file with the Governor a yearly report of its activities under these statutes.

"Article 6062 subjects any gas pipe line violating the statutes or failing to comply with a Commission order to a penalty of $100.00 to $1,000.00 for each separate offense, each day being a separate offense. In addition, a civil suit for a like amount plus attorneys' fees may be brought by any 'person, corporation, or association of persons' against whom the gas pipe line has discriminated.

"Article 6063 provides that the offending gas pipe line may be placed in receivership for any of the foregoing violations.

"Article 6064 provides for a pipe line expert to assist the Commission.

"Article 6065 provides the Commission with employees to help it enforce the Act.

"Article 6066 directs that expenses of administering the law are to be paid out of the pipe line gross receipts tax levied by Article 6060."

Remembering that we are seeking a power legislatively vested in the Commission which authorizes it to determine the contract between Alamo and the City of San Antonio to be null and void, where is it to be found? Most of the provisions of this Act are patently irrelevant to this question and need no discussion.

Articles 6050 and 6051 provide that the business of operating a gas pipe line shall

be subject to the jurisdiction therein conferred upon the Commission and to regulation by it. Following Arts. 6052 and 6053 are clearly foreign to such pretension of authority.

Appellee states that Art. 6054 "sets at * .* * rest" any doubt as to the full scope of the Commission's jurisdiction. This may well be, but when its jurisdiction comes to rest, does it contain power to invalidate a contract such as exists between Alamo and the City of San Antonio? The statute authorizes the Commission to review, revise and regulate agreements "establishing and prescribing prices, rates, rules and regulations and conditions of service" made by pipe line companies. In order for the Commission to perform these duties there must be an agreement in existence to be reviewed, revised and regulated, else the statutory authority of the Commission would be suspended in a vacuum. These functions of the Commission would expire for want of a res. Such would be the situation if the Commission exercised authority to nullify the Alamo-City contract.

"Review" does not mean nullification.

"Revise" does not mean nullification.

"Regulate" does not mean nullification.

■ Does the sum of these three words mean nullification, or should .we construe them as meaning nullification? Before making a categorical answer to this question, let us examine, briefly, the effect of an affirmative answer.

United, if successful, would be the owner of a practically perpetual monopoly to supply gas to the City of San Antonio. This is so because if Alamo cannot contract with the City, then no other company similarly situated could. Only companies who were willing to put themselves in a position comparable to the one held by United could contract with the City. This would be a very expensive, hazardous and unbusinesslike undertaking. Even should an adventurous company make all pre-contract investments and improvements so as to equal United, there would still remain the public interest problems relating to duplication of facilities and the increased price of gas to other customers of United. We repeat, United would have a practically perpetual monopoly.

If United has such a monopoly, then all other in place gas pipe lines supplying cities and other customers would also have similar monopolies. Should these momentous, far-reaching consequences be accomplished by judicial construction which in this case would be pure judicial legislation? Our answer is "No."

Richland Gas Co. v. Hale, 169 La. 300, 125 So. 130, is a very persuasive authority. It is based, in part, upon Texas authority. The issue there presented was whether a gas utility had the right to transact its business before the Public Service Commission of the State had found its business operations to be in the public interest. In answering in the negative the Court stated:

"The commission has the power to supervise and regulate public utilities as it finds them. It has nothing to do with creating or bringing them into existence. * * *

. "There is no law of this state requiring the grantee of a municipal franchise to secure from the commission a certificate of public convenience or necessity before engaging in the business provided for by the franchise.

. "[4] 'The commission possesses no other power than that conferred upon it by the law of its creation, and under that law it has at the utmost only the power that is conferred in express terms or by necessary or fair implication.' * * *

"The Louisiana Public Service Commission is created by section 3 of article 6 of the Constitution of 1921, and its

powers are set forth in section 4 of the same article as follows:

" 'Section 4. The Commission shall have and exercise all necessary power and authority to supervise, govern, regulate and control all common carrier railroads, street railroads, interurban railroads, steamboats and other water craft, sleeping car, express, telephone, telegraph, gas, electric light, heat and power, water works, common carrier pipe lines, canals, (except irrigation canals) and other public utilities in the State of Louisiana, and to fix reasonable and just single and joint line rates, fares, tolls or charges for the commodities furnished, or services rendered by such common carriers or public utilities, except as herein otherwise provided.

" 'The power, authority, and duties of the Commission shall affect and include all matters and things connected with, concerning, and growing out of the service to be given or rendered by the common carriers and public utilities hereby, or which may hereafter be made subject to supervision, regulation and control by the Commission. The right of the Legislature to place other public utilities under the control of and confer other powers upon the Louisiana Public Service Commission respecting common carriers and public utilities is hereby declared to be unlimited by any provision of this Constitution.'

\*   \*   \*   \*   \*   \*

"In Ex parte Patterson, 42 Tex.Cr.R. 256, 58 S.W. 1011, 1012, 51 L.R.A. 654, it is said:

" 'The power to regulate does not properly include the power to suppress or prohibit, for the very essence of regulation is the existence of something to be regulated. \* \* \* The power *to regulate includes the power to restrain, so long as the restraint imposed is reasonable.* The restraint must not

so confine the exercise of any occupation as to amount to a prohibition.'

" 'The term "regulate" \* \* \* ordinarily implies, not so much the establishment of a new thing, as the arrangement in proper order of such as already exists.' United States v. Harris, 26 Fed.Cas. 185, 192 [No. 15315].

"So, the terms 'supervise, govern, and control' necessarily assume the existence and operation of some public utility, and 'matters and things connected with, concerning, and growing out of the service to be given and rendered,' as expressly declared in section 4 of article 6 of the Constitution of 1921, in conferring upon the Louisiana Public Service Commission powers of supervision, regulation, and control respecting common carriers and public utilities of the state.

"If a public utility cannot operate as such without obtaining a certificate of public necessity or convenience, and if the commission has the power to withhold such certificate, then it has the power to prohibit the operation of such utility and to confiscate its property. Such is not the law in this state."

The words "supervise, govern, regulate and control," interpreted by the Louisiana Supreme Court, seem to us to be as broad as the words "review, revision and regulation" found in the Cox Bill, yet the Court held that they do not embrace the power of prohibition.

Municipal Gas Company v. Lone Star Gas Company, Tex.Civ.App., 259 S.W. 684, affirmed, 117 Tex. 331, 3 S.W.2d 790, strongly supports our views. It involved and construed the Cox Bill. We quote from the opinion of the Court of Civil Appeals enough to show the nature of the suit and the ruling pertinent here, which received express Supreme Court approval:

"This suit was instituted by appellant, Municipal Gas Company, against

appellee, Lone Star Gas Company, to restrain it from declaring a forfeiture of four contracts, under which appellant purchased and received from appellee its supply of natural gas for distribution to the consumers in the territory in which it operated; * * *.

"It is contended that these contracts are not now binding in law because, since their execution, the Thirty-Fifth Legislature enacted the Cox Pipe Line Bill; that this enactment vests, in the Railroad Commission of Texas, jurisdiction over all concerns owning and operating natural gas pipe lines in this state, and that the effect of this legislation is to abrogate these contracts, at least to the extent that the courts cannot enforce them. Section 3 of the act does vest in the Railroad Commission the power and the duty to establish a fair and equitable division of the proceeds of the sale of gas between the companies transporting or producing the gas, and the companies distributing or selling it; and it further declares that all orders and agreements of any company or corporation, or any person or persons, controlling such pipe lines, establishing or prescribing prices, rates, rules, and regulations and conditions of service, shall be subject to review, revision, and regulation by the Railroad Commission.

"An examination of this act discloses that it was the public interest, affected by those who produced, transported, and marketed natural gas, that induced the Legislature to enter this field and make the producers and handlers of this commodity the subject of legislative control. Indeed, it may be said that it is only because of this public interest that the Legislature could enter such a field and enact such legislation. For the public weal, it has given the Railroad Commission power, under certain prescribed procedure, to review and revise rates fixed by municipalities for the payment to distributing companies for gas used by the consumers residing in such municipalities. Such commission, as stated above, also has the power 'to establish a fair and equitable division of the proceeds of the sale of gas between the companies transporting or producing the gas, and the companies distributing or selling it.' This latter power is intended to be exercised by the commission only when necessary to do so in order that it may be able to do justice, both to the consuming public and the distributing company, in the matter of fixing rates between such consumer and distributor of gas. *It is not believed that this act gives to the Railroad Commission power of revision over a pre-existing contract between a producing and distributing company independent of any issue or question of the making or revision of such rates. In this suit there is no issue as to rates charged the public, and no issue of the adequacy of service to the public involved; in fact, there is nothing in our opinion that gives to the Railroad Commission jurisdiction of any question at issue in this case. It does not follow that, because some time in the future the contracts under which appellant and appellee are now operating may yield to revision because of the exigencies of public interest, appellee may ignore its binding obligations, destroy the property of appellant invested on faith in the integrity of appellee's promises, and remit appellant to the Railroad Commission for relief. On the contrary, we believe appellee should perform its contract obligations until relieved therefrom on a proper showing that public interest demands such a course.*"

The Railroad Commission was not a party to this suit. Its absence did not deter the courts from proceeding to determine the validity and effect of the involved contracts. The Commission being devoid of jurisdiction to decide those questions in

that case should be devoid of jurisdiction to decide similar questions here.

The remaining statutes taken from the Cox Bill and analyzed by appellee are completely alien to the authority it seeks to find in the Bill, and will not be discussed.

Appellants forcefully contend that should we find the Commission vested with statutory authority to nullify contracts of the general type as the Alamo-City contract that such authority would not extend to similar contracts with a home rule city as is the City of San Antonio. It is unnecessary for us to decide this question and we express no opinion concerning it.

■ It is our opinion that the Railroad Commission correctly held that it was without jurisdiction to grant the relief appellee sought from it, and that the judgment of the Trial Court holding to the contrary should be reversed and judgment here rendered that appellee take nothing by reason of its appeal from such order of the Commission. It is so decreed.